**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **TNJB, INC.,** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Case No.** |
| | ) | |
| **THE CINCINNATI INSURANCE** | ) | |
| **COMPANY, INC.** | ) | **JURY TRIAL DEMANDED** |
| **Defendant** | ) | |
| | ) | |

## COMPLAINT

Comes now the Plaintiff TNJB, Inc., by and through counsel, and states as follows for its Complaint against Defendant Cincinnati Insurance Company, Inc.:

### THE PARTIES

1.      Plaintiff TNJB, Inc., is an Illinois corporation, with its principal place of business in Edwardsville, Illinois. Plaintiff owns and operates two food and beverage establishments in southern Illinois, doing business as 4202 Main Street Brewing Company in Belleville, Illinois.

2.      Defendant Cincinnati Insurance Company ("Cincinnati") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

3.      Defendant sold commercial insurance policies throughout the State of Illinois which, unlike its competitors, did not exclude coverage for losses due to viruses. Yet Defendant has nonetheless refused to honor losses resulting from the COVID-19 pandemic; the related Illinois Executive Orders affecting businesses, bars, and restaurants; and the ensuing economic crisis.

### NATURE OF THE ACTION

4.      Plaintiff purchased and Cincinnati issued a business, property, and casualty insurance policy to Plaintiff with effective dates from August 6, 2017 to August 6, 2020 and Policy No. 05ETD041206. (see Exhibit 1)

5.      The Policy is an "all-risk" product, meaning Plaintiff was insured from loss from all-risks not specifically listed in the policy exclusions.

6.      The insurance policy purchased by Plaintiff included a list of policy exclusions.

7.      The insurance policy purchased by Plaintiff did not include a policy exclusion for COVID-19.

8.      The insurance policies purchased by Plaintiff covered loss caused by viruses.

9.      The insurance policies purchased by Plaintiff covered losses caused by civil authority shutdowns.

10.     In March 2020, Plaintiff experienced substantial losses and damage as a result of the presence of COVID-19 and the risk of loss or damage from COVID-19.

11.     The presence of COVID-19 in or around Plaintiff's business prevented it from operating beginning in March 2020.

12.     Plaintiff was further prevented from operating the business as a result of state civil authority orders prohibiting customer access to the premises as a result of the presence and spread of COVID-19, a communicable disease that the World Health Organization has deemed a pandemic which resulted in federal disaster declarations for every county in the United States.

13.     COVID-19 is a highly communicable disease.

14.     COVID-19 can be transmitted by air, touch, and close proximity to others.

15.     COVID-19 can be carried and spread by asymptomatic people.

16.     Despite Plaintiff's insurance coverage under its policy, Defendant has refused to honor its policy commitments to Plaintiff, resulting in substantial losses to Plaintiff.

17.     As of the date of this filing, Defendant has refused to provide Plaintiff with a copy of its certified insurance policy.

## JURISDICTION AND VENUE

18.      Jurisdiction in this Court is proper under 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendant are citizens of different states and the matter in controversy exceeds $75,000.

19.     Venue in this court is proper under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in the southern district of Illinois, the situs of Plaintiff's business operations, the insurance contract, and a substantial part of Plaintiff's losses.

## FACTUAL ALLEGATIONS

### *Plaintiff's Primary Insurance Coverage from Defendant*

20.     Plaintiff has maintained and paid premiums for insurance from Defendant.

21.     Plaintiff's insurance policy provides that "Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the 'loss' is" specifically excluded or limited by the policy.

22.     Defendant is a member or subscriber of Insurance Service Properties, Inc. ("ISO").

23.     ISO is an insurance industry organization that drafts model policy language for insurers.

24.     Defendant's policy in this case includes language adopted from ISO.

25.     Since at least 2006, ISO has provided language for insurers to use to exclude losses stemming from viruses from its insurance products.

26.     The sample ISO language for a virus exclusion states, "We will not pay for loss or damage caused by or resulting from any virus, bacterium, or other microorganism that induces or is capable of inducing physical distress, illness or disease."

27.     Plaintiff's policy does not contain any exclusion for viruses or pandemics – with the exception of an exclusion limited to a Crisis Events endorsement that only applies to Crisis Events coverage.

28.     Plaintiff's policy contains special "Business Income and Extra Expense" coverage that provides as follows:

> **(1) Business Income**
> We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss. …
>
> **(2) Extra Expense**
> We will pay "Extra Expense" you incur during the "period of restoration": (a) To avoid or minimize the "suspension" of business and to continue "operations; 1) At the "premises," or … (b) To minimize the "suspension" of business if you cannot continue "operations". …

**(3) Tenant Premises** …

**(4) Civil Authority**
We will pay for the actual loss of "Business Income" you sustain and "Extra Expense" you incur caused by action of civil authority that prohibits access to the "premises" due to direct physical "loss" to property, other than at the "premises, caused by or resulting from any Covered Cause of Loss.

This coverage will apply for a period of up to 30 consecutive days from the date of that action.

### *Plaintiff's Crisis Event Expense Coverage Endorsement from Cincinnati*

29.     The only mention of biological viruses or pandemics in Plaintiff's contract with Cincinnati is in the inapplicable "Crisis Event" endorsement.

30.     The "Crisis Event" portion of the policy bears no relationship to this matter and does not have an effect on the business income, extra expense, civil authority, or other provisions of Plaintiff's contract with Cincinnati.

31.     Under the Crisis Event Expense Endorsement, Cincinnati promised Plaintiff to pay for "post crisis event expense" and business income loss resulting from a "covered crisis event" at a "covered location" for up to 60 consecutive days after the event.

32.     The Crisis Event endorsement exclude coverage for, *inter alia*, losses due to a "covered communicable disease."

33.     The Cincinnati Crisis Event endorsement defines "covered communicable disease" as:

"Covered communicable diseases" means any disease or any related or resulting diseases, virus, complexes, symptoms, manifestations, effects, conditions or illnesses, except this endorsement does not apply to any "loss" directly or indirectly attributable to Anthrax, Avian Influenza, Crimean-Congo Hemorrhagic Fever, Dengue Hemorrhagic Fever, Ebola Hemorrhagic Fever, Francisella Tularensdis, Influenza, Lassa Fever, Marburg Hemorrhagic Fever, Meningococcal disease, Plague, Rift Valley Fever, Severe Acute Respiratory Syndrome, Smallpox, Tularemia, Yellow Fever or any pandemic or similar influenza which is defined by the United States Center for Disease Control as virulent human influenza that may cause global outbreak, or pandemic, or serious illness.

34.     The Crisis Event endorsement includes a communicable diseases exclusion that includes the same list provided in the definition of "covered communicable diseases" and expressly states that a disease covered by the definition of "covered communicable disease" is not excluded.

35.     COVID-19 is not specifically excluded from the Crisis Event coverage.

36.     COVID-19 is not generally excluded from the Crisis Event coverage through its "catch-all" exclusion for "any pandemic or similar influenza which is defined by the United States Center for Disease Control as virulent human influenza that may cause global outbreak" because COVID-19 is not defined by the CDC as "virulent human *influenza*."

### *The COVID-19 Pandemic*

37.     Coronavirus (COVID-19) is a highly contagious airborne virus that has spread throughout the world and the United States.

38.     COVID-19 is also known as coronavirus and SARS-CoV-2.

39.     COVID-19 is a communicable disease.

40.     COVID-19 is not a human virulent influenza.

41.     The World Health Organization has declared COVID-19 to be a pandemic.

42.     The United States Centers for Disease Control explains that a "pandemic" is a "global outbreak" of a virus.[1]

43.     The dictionary definitions of "pandemic" include: "(1) (of a disease) prevalent throughout an entire country, continent, or the whole world, (2) general; universal, (3) a pandemic disease."[2]

44.     COVID-19 spreads through respiratory droplets cast through the air when an infected person breathes, coughs, sneezes, talks, or sings.

45.     The United States Centers for Disease Control has stated:

    a.      "Everyone is at risk of getting COVID-19."

---

[1] https://www.cdc.gov/flu/pandemic-resources/
[2] https://www.dictionary.com/browse/pandemic?s=t

b.    "You can become infected by coming into close contact (about 6 feet or two arm lengths) with a person who has COVID-19. COVID-19 is primarily spread from person to person."

c.    "You can become infected from respiratory droplets when an infected person coughs, sneezes, or talks."

d.    "You may also be able to get it by touching a surface or object that has the virus on it, and then by touching your mouth, nose, or eyes."[3]

46.    The respiratory droplets can infect other people, particularly in enclosed areas.

47.    In a July 6 letter, two-hundred thirty-nine infectious disease experts explained:

Studies by the signatories and other scientists have demonstrated beyond any reasonable doubt that viruses are released during exhalation, talking, and coughing in microdroplets small enough to remain aloft in the air and pose a risk of exposure at distances beyond 1 to 2 m from an infected individual. For example, at typical indoor air velocities, a 5 [micrometer][4] droplet will travel tens of meters, much greater than the scale of a typical room, while settling from a height of 1.5m to the floor. … This poses the risk that people sharing such environments can potentially inhale these viruses, resulting in infection and disease.[5]

48.    The CDC explains that COVID-19 droplets can also attach to surfaces, which can later infect a person who touches the surface and then their mouth, nose, or eyes.

49.    Studies have found that COVID-19 is detectable for up to 24 hours on cardboard and three days on plastic or stainless-steel surfaces.

50.    Cardboard, plastic, and stainless steel are all surfaces and materials used by Plaintiff throughout its insured facilities.

51.    COVID-19 spreads through pre-symptomatic or asymptomatic carriers.

52.    An article in the New England Journal of Medicine explains:

A key factor in the transmissibility of Covid-19 is the high level of [virus] shedding in the upper respiratory tract, even among pre-symptomatic patients[.] … [L]ive coronavirus clearly sheds at high concentrations from the nasal cavity even before symptom development. … [A]symptomatic persons are playing a major role in the transmission [and] [s]ymptom-based screening alone failed to detect a high

---

[3] https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf
[4] A micrometer equals one millionth of a meter or one thousandth of a millimeter.
[5] https://academic.oup.com/cid/article/doi/10.1093/cid/ciaa939/5867798

proportion of infectious cases and was not enough to control transmission in [a controlled nursing home] setting.[6]

53.     Due to its incredibly infectious nature, COVID-19 spread rapidly around the globe beginning in late 2019 and early 2020.

54.     Although the first confirmed cases of COVID-19 in the United States were reported on February 26 and 28, 2020, evidence accepted by the CDC suggested the community transmissions in the United States actually began in late January or early February.[7]

55.     In response to the COVID-19 pandemic, state authorities have mandated social distancing orders that limited the number of people who can gather in any setting and closed non-essential businesses.

56.     The orders may have slowed but have not stopped the spread of COVID-19.

57.     As of July 7, 2020, COVID-19 cases and deaths were reported to be at least:

     a.     Globally, nearly 11.7 million cases and 540,000 deaths;

     b.     In the United States, nearly 3 million cases and 131,000 deaths;

     c.     In Illinois, nearly 150,000 cases and more than 7,000 deaths.

     d.     In St. Clair County, more than 2,000 cases and 137 deaths.[8]

58.     Even these COVID-19 statistics are recognized as underinclusive.

59.     CDC data shows that the "number of coronavirus infections in many parts of the United States is more than 10 times higher than the reported rate."

60.     Researchers also estimate the COVID-19 death toll is undercounted.

61.     As a result of the rapid spread and escalating loss and damage to human life and property, state and local governments have taken action to protect public health and property.

62.     In Illinois, the government's response began in earnest on March 9, 2020.

63.     On March 9, 2020, in direct response to the COVID-19 pandemic, Illinois Governor J.B. Pritzker issued a gubernatorial disaster declaration under 20 ILCS 3305/7, finding "that a

---

[6] https://www.nejm.org/doi/full/10.1056/nejme2009758
[7] https://www.cdc.gov/mmwr/volumes/69/wr/mm6922e1.htm
[8] See coronavirus.jhu.edu/. Last visited July 7, 2020 at 1:16 p.m.

disaster exists within the State of Illinois" "specifically declar[ing] all counties in the State of Illinois as a disaster area." *See* Exhibit 2.

64.    On March 16, Gov. Pritzker issued Illinois Executive Order 2020-07.

65.    Executive Order 2020-07 imposed a civil authority order prohibiting customer access to Plaintiff's business premises.

66.    Executive Order 2020-07 stated, among other things:

WHEREAS, the Illinois Department of Public Health recommends Illinois residents avoid group dining in public settings, such as in bars and restaurants, which usually involves prolonged close social contact contrary to recommended practice for social distancing, and

WHEREAS, frequently used surfaces in public settings, including bars and restaurants, if not cleaned and disinfected frequently and properly, also pose a risk of exposure, and

WHEREAS, current testing availability has identified further spread of confirmed cases throughout the State of Illinois, and it is expected that increased testing capacity would demonstrate that COVID-19 is circulating in communities across Illinois that currently have not identified a confirmed case, and

WHEREAS, the number of suspected COVID-19 cases in Illinois is increasing exponentially and across more locations in Illinois, indicating that drastic social distancing measures are needed, even in communities where confirmed cases have not yet been identified, to reduce the number of people who become sick at any given time and the possibility of exhausting our health care resources; and

WHEREAS, the ongoing spread of COVID-19 and the danger the virus poses to the public's health and wellness require the reduction of on-premises consumption of food and beverages; and …

WHEREAS, it is necessary and appropriate for the state of Illinois to immediately take measures to protect the public's health in response to this COVID-19 outbreak;

THEREFORE, by the powers vested in me as the Governor of the State of Illinois, and pursuant to Section 7(1), 7(2), and 7(8) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, I hereby order the following:

Section 1. Beginning March 16, 2020 at 9 p.m. through March 30, 2020, all businesses in the State of Illinois that offer food or beverages for on-premises consumption—including restaurants, bars, grocery stores, and food halls—must suspend service for and may not permit on-premises consumption. …

Section 2. Beginning March 18, 2020, all public and private gatherings in the State of Illinois of 50 people or more are prohibited for the duration of the Gubernatorial Disaster Proclamation. A public or private gathering includes community, civic, public leisure, faith-based events, sporting events with spectators, concerts,

conventions, and any similar event or activity that brings together 50 or more people in a single room or a single space at the same time. …

EO 2020-07 is attached as Exhibit 3.

67.    Executive Order 2020-07 forced Plaintiff to close its business from March 16 to April 1, 2020.

68.    Executive Order 2020-07 ordered the shutdown Plaintiff's business and premises prohibited access thereto through its prohibition against on-premises consumption of food and beverages and gatherings of more than 50 people.

69.    EO 2020-07 prohibited Plaintiff's customers from accessing its business premises.

70.    On March 26, 2020, President Donald J. Trump approved and "declared that a major disaster exists in the State of Illinois and ordered Federal assistance to supplement State, tribal, and local recovery efforts in the areas affected by the Coronavirus Disease 2019 (COVID-19) pandemic beginning on January 20, 2020 and continuing."[9] The federal disaster declaration extended throughout the entire state of Illinois.

71.    On April 1, Gov. Pritzker again declared a statewide disaster, specifically finding:

> WHEREAS, the circumstances surrounding COVID-19 have resulted in the occurrence and threat of widespread and severe damage, injury, and loss of life and property under Section 4 of the Illinois Emergency Management Act.

See Illinois Disaster Declaration, April 1, 2020 attached as Exhibit 4.

72.    On April 1, Gov. Pritzker issued Illinois Executive Order 2020-18.

73.    Executive Order 2020-18 imposed a new civil authority order prohibiting access to bars and restaurants. EO 2020-18 is attached as Ex. 5.

74.    Executive Order 2020-18 closed Plaintiff's business from April 1 through April 30.

75.    Executive Order 2020-18 shut down of Plaintiff's business and premises and prohibited access thereto through its prohibition against on-premises consumption of food and beverages and gatherings of more than 50 people.

---

[9] https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-illinois-disaster-declaration-2/

76.     As a result of EO 2020-18, Plaintiff's customers were prohibited from its premises.

77.     On or about April 12, 2020, President Donald Trump signed presidential disaster declarations for all locations in all 50 states for the first time in the history of our nation.

78.     On April 30, Gov. Pritzer again "declared all counties in the State of Illinois as a disaster area." See Illinois Disaster Declaration, April 30, 2020, attached as Exhibit 6.

79.     On April 30, Gov. Pritzer issued Illinois Executive Orders 2020-32 and 2020-33.

80.     Executive Order 2020-32 provided that "[r]estaurants and other facilities that prepare and serve food" may re-open "but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out." EO 2020-32 created an exception that "schools and other entities that provide food services" under an exemption "shall not permit the food to be eaten at the site where it is provided, or at any other gathering site due to the virus's propensity to physically impact surfaces and personal property." EO 2020-32 is attached as Exhibit 7.

81.     Executive Order 2020-33 imposed a new civil authority order prohibiting access to bars and restaurants. EO 2020-33 is attached as Exhibit 8.

82.     Executive Order 2020-33 closed Plaintiff's business from April 30 to May 29.

83.     Executive Order 2020-33 shut down Plaintiff's business and premises and prohibited access thereto through its prohibition against on-premises consumption of food and beverages and gatherings of more than 50 people.

84.     As a result of EO 2020-33, Plaintiff's customers were prohibited from entering its premises.

85.     On May 29, Gov. Pritzker again "declared all counties in the State of Illinois as a disaster area." See Illinois Disaster Declaration, May 29, 2020 attached as Exhibit 9.

86.     On May 29, Gov. Pritzker issued Illinois Executive Orders 2020-38 and 2020-39.

87.     Illinois Executive Order 2020-38 provided that "[r]estaurants and other facilities that prepare and serve food" may re-open "but only for consumption off-premises, through such

means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out." EO 2020-28 also limited gatherings to 10 persons or less. EO 2020-38 is attached as Exhibit 10.

88.     Executive Order 2020-39 imposed a new civil authority order prohibiting access to bars and restaurants. EO 2020-39 is attached as Exhibit 11.

89.     Executive Order 2020-39 closed Plaintiff's business from May 29 to June 26.

90.     Executive Order 2020-39 shut down Plaintiff's business and premises and prohibited access thereto through its prohibition against on-premises consumption of food and beverages and gatherings of more than 50 people.

91.     As a result of EO 2020-39, Plaintiff's customers were prohibited from its premises.

92.     On June 26, Gov. Pritzker again "declared all counties in the State of Illinois as a disaster area." See Illinois Disaster Declaration, May 29, 2020 attached as Exhibit 12.

93.     On June 26, 2020, Gov. Pritzker issued Illinois Executive Order 2020-43 to "safely and conscientiously resume and expand activities that were paused or limited as COVID-19 cases rose exponentially[.]" EO 2020-42 is attached as Exhibit 13.

94.     EO 2020-43 provided that restaurants and bars could "resume service for on-premises consumption, as permitted by DCEO guidance."

95.     The DCEO document incorporated by reference and made mandatory by EO 2020-43 continues to prohibit access to Plaintiff's business premises. EO 2020-43 is attached as Exhibit 13-1.

96.     The DCEO mandate is attached as Exhibit 14.

97.     Under the DCEO civil authority mandates, Plaintiff may only serve parties of six persons or fewer who are being served outdoors and where each person in a party is distanced at least six feet away from any person in any other party. Access to the inside premises of Plaintiff's business remain prohibited by this order.

98.     Executive Order 2020-43 closed Plaintiff's indoor business from June 26 to present.

99.     Executive Order 2020-43 shut down Plaintiff's business and indoor premises and prohibited access thereto through its prohibition against indoor consumption of food and beverages and gatherings of more than 50 people.

100.    Executive Order 2020-43 also prohibits access to Plaintiff's outdoor premises to the extent Plaintiff may not serve parties larger than six and must space each party at least six feet apart.

101.    As a result of EO 2020-43, Plaintiff's customers were prohibited from its premises.

102.    Plaintiff's business and premises were and continue to be directly impacted by COVID-19.

103.    Plaintiff's business and premises were and continue to be directly impacted by Gov. Pritzker's four civil authority shutdown complete orders.

104.    As Gov. Pritzker's orders found, "frequently used surfaces in public settings, including bars and restaurants, if not cleaned and disinfected frequently and properly, … pose a risk of exposure" to COVID-19.

105.    The risk of direct physical loss caused by COVID-19 was further enhanced by the facts that COVID-19 particles can survive on solid surfaces for significant periods of time, can be spread long distances through the air, and can be spread by pre-symptomatic or asymptomatic individuals.

106.    Plaintiff's business and premises suffered a "Covered Cause of Loss" to its property because the policy defines "Covered Causes of Loss" to mean "RISKS OF DIRECT PHYSICAL LOSS" unless the loss is specifically covered by a policy exclusion or limitation, and Plaintiff's policy had no exclusions or limitations relating to COVID-19, coronavirus, viruses, or pandemic.

107.    Plaintiff's business and premises suffered compensable loss under the primary policy's provisions for Business Income coverage.

108.    Plaintiff's business and premises suffered compensable loss under the primary policy's provisions for Extra Expense coverage.

109.   Plaintiff's business and premises suffered compensable loss under the primary policy's provisions for Civil Authority coverage.

110.   Gov. Pritzker's orders prohibited access to Plaintiff's business premises due to damage to other properties occurring in St. Clair County and throughout the state of Illinois.

111.   Plaintiff suffered compensable loss under the Crisis Event Expense endorsement.

### *Plaintiff's Claim and Defendant's Vexatious and Unreasonable Denial and Delay*

112.   Plaintiff submitted a claim to Defendant seeking coverage under the policy shortly after Gov. Pritzker issued Executive Order 2020-07.

113.   Executive Order 2020-07 prohibited access to Plaintiff's business premises.

114.   Executive Order 2020-07 prohibited such access due to damage caused by COVID-19 throughout the state of Illinois.

115.   On March 30, 2020 a senior claims specialist for Defendant responded with a letter informing Plaintiff that Cincinnati was investigating the claim "under a full reservation of rights."

116.   Defendant's March 30 letter requested Plaintiff to:

a.   "Provide copies of all inspection reports and test reports referring or relating to actual or suspected presence of Coronavirus" at the premises, "documents referring or relating to the presence of coronavirus" at the premises;

b.   "Please state whether you have been ordered by a civil authority, such as a government official, to close, or restrict access to, your premises." The civil authority request also asked for Plaintiff to "identify the civil authority that issued the order or orders," "identify the date and nature of the order or orders," and "supply a copy of the order or orders;" and

c.   "Identify any property, other than your own, that suffered direct physical loss or direct physical damage, thereby causing the civil authority order to issue. Additionally, please specify these details and supply these documents: (1) the reason or reasons why you believe that there was direct physical loss or direct physical damage to premises or to property at premises other than your own

premises; the reason or reasons why you believe that Coronavirus that was present at that other premises caused the issuance of the civil authority order involved in your claim; (2) Copies of all inspection reports and test reports referring or relating to direct physical loss or direct physical damage to that other premises; and (3) copies of all inspection reports and test reports referring or relating to actual or suspected presence of coronavirus at that other premises or property at that other premises.

A copy of this letter is attached as Exhibit 15

117.    On March 30, Defendant was fully aware of Gov. Pritzker's civil authority order restricting access to Plaintiff's business premises at the time that Defendant sent Plaintiff a letter requesting Plaintiff to provide documentation of a civil authority order restricting access.

118.    On March 30, Defendant was fully aware that Gov. Pritzer's order declared a state of emergency existed in every county of Illinois because coronavirus had spread and caused damage throughout the state of Illinois.

119.    On April 14, a new claims adjustor for Defendant informed Plaintiff that its case had been transferred to him. A copy of this letter is attached as Exhibit 16.

120.    On May 8, Defendant made a follow-up request substantially similar to the documents requested in the March 30 letter. A copy of this letter is attached as Exhibit 17.

121.    On May 8, Defendant was fully aware of Illinois Executive Orders 2020-08, 2020-18, 2020-32, and 2020-33, each of which declared a statewide emergency in Illinois due to the spread of COVID-19 and damage to persons and property in every county of the State, and that such order prohibited access to Plaintiff's business premises.

122.    On May 22, counsel for Plaintiff sent Defendant a letter on Plaintiff's behalf notifying Defendant, to the extent there was any doubt, Plaintiff was making a claim "for all coverages available under any Cincinnati policy or policies held by … TJBC, Inc." A copy of this letter is attached as Exhibit 18.

123.    The May 22 letter put Defendant on notice that Defendant's refusal to provide coverage and reservation of rights by its letters dated Mary 30 and May 8, 2020 constituted vexatious and unreasonable denial and delay of insurance claims under common law and 215 ILCS 5/155.

124.    The May 22 letter also provided copies of relevant Illinois Executive Orders that had been issued up to that point.

125.    On May 29, Defendant denied coverage. A copy of this letter is attached as Exhibit 19.

126.    Defendant's denial letter stated the following about Civil Authority coverage:

> Although your client closed their business in response to a governmental order, there is no evidence that the order was entered because of direct damage to property at other locations or dangerous physical conditions at other locations. Moreover, the order does not restrict access to the area immediately surrounding your premises. Because these requisite elements of the Civil Authority coverage are not present here, coverage is unavailable under the Policy.

127.    Defendant's stated reasons for the Civil Authority coverage denial are false.

128.    Gov. Pritzker's orders specifically found that dangerous physical conditions exist at locations throughout the state of Illinois.

129.    Gov. Pritzker's orders were necessary to protect the "health, safety, and welfare of the People of the State of Illinois."

130.    Gov. Pritzker's orders find that dangerous physical conditions specifically existed at restaurants and bars.

131.    Gov. Pritzker's Civil Authority orders restricting access to Plaintiff's premises state on their face that they are entered because of damage and dangerous physical conditions throughout the state of Illinois.

132.    Defendant's claim that the orders "do[] not restrict access to the area immediately surrounding your premises" is not relevant.

133.     Per the language of the insurance contract written by Defendant, Civil Authority coverage is triggered when Business Income is lost, and Extra Expense incurred "caused by action of civil authority that prohibits access to the 'premises'[.]"

134.     There policy does not contain any language regarding "access to the area immediately surrounding your premises."

135.     Even if there were language requiring prohibition on access "to the area immediately surrounding your premises," the Illinois Executive Order clearly prohibit access.

## COUNT I – DECLARATORY JUDGMENT

136.     Plaintiff realleges all previous allegations as if set forth fully herein.

137.     Plaintiff bring this Court pursuant to 28 U.S.C. §§ 2201 and 2202, the Declaratory Judgment Act, which empowers this Court to declare the rights and legal relations of the parties to this dispute.

138.     There is a dispute between Plaintiff and Defendant whether Plaintiff is entitled to coverage under its policy with Defendant.

139.     Plaintiff specifically made a coverage demand.

140.     Defendant denied coverage.

141.     Defendant's denial breached the policy in the following ways:

   a.     Defendant's insurance policy covers loss that Plaintiff incurred as a result of "Covered Causes of Loss," including COVID-19.

   b.     Defendant's insurance policy covers loss that Plaintiff incurred as a result of Illinois Executive Orders 2020-07, 18, 32, 33, 38, 39, and 43.

   c.     Defendant's insurance policy endorsement for Crisis Event coverage covers losses that Plaintiff incurred as a result of crisis events, which would include losses caused by COVID-19.

142.     Plaintiff sustained lost Business Income due to its necessary suspension of operations during a period of restoration caused by direct physical loss to property at its premises.

143.     Plaintiff sustained Extra Expense loss during its period of restoration.

144.    Plaintiff sustained Business Income and Extra Expense loss under its Civil Authority coverage because of multiple separate actions of civil authority that prohibited and continue to prohibit access to Plaintiff's premises due to direct physical losses to property other than at the premises.

145.    Plaintiff respectfully requests entry of an order and judgment providing that:

        d.     Plaintiff's policy entitles Plaintiff to coverage for Business Income loss as a result of direct physical loss of Plaintiff's property at its premises incurred as a result of COVID-19;

        e.     Plaintiff's policy entitles Plaintiff to coverage for Extra Expense loss as a result of direct physical loss of Plaintiff's property at its premises incurred as a result of COVID-19;

        f.     Plaintiff's policy entitles Plaintiff to coverage for Civil Authority as a result of Illinois EOs 2020-07, 18, 32, 33, 38, 39, and 42.

        g.     Plaintiff's policy entitles Plaintiff to coverage under the Crisis Event endorsement.

        h.     Plaintiff is entitled to coverage for any substantially similar Executive Orders that prohibit access to its business premises in the future;

        i.     Any other declaratory judgment or relief the Court deems proper.

## COUNT II – BREACH OF CONTRACT

146.    Plaintiff realleges all previous allegations as if set forth fully herein.

147.    By purchasing the insurance, Plaintiff entered into a contract with Defendant.

148.    The insurance policy is a valid and enforceable contract.

149.    Plaintiff performed all of its obligations under the policy, including payment for the policy and providing Defendant timely notice of its claims.

150.    Defendant promised to pay Plaintiff's losses caused by "RISKS OF DIRECT PHYSICAL LOSS," "direct physical loss," and "CIVIL AUTHORITY," including Business Income and Extra Expense.

151.    By endorsement, Defendant promised to pay Plaintiff's losses and expenses incurred through Crisis Event coverage.

152.    As described above, all events necessary to trigger coverage occurred.

153.    Defendant refused to cover Plaintiff's losses after having been notified by Plaintiff.

154.    By refusing to cover Plaintiff's losses, Defendant breached the insurance contract.

155.    As a direct and proximate result of Defendant's breach, Plaintiff sustained damages.

### COUNT III – VEXATIOUS REFUSAL PURSUANT TO 215 ILCS 5/15

156.    Plaintiff realleges all previous allegations as if set forth fully herein.

157.    The contract between Plaintiff and Defendant is an Illinois insurance contract.

158.    In Illinois, pursuant to 215 ILCS 5/15, an insured may bring a vexatious refusal claim against the insurer:

> In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney's fees, other costs, plus an amount not to exceed any one of the following amounts:
>
> > (a) 60 percent of the recovery;
> > (b) $60,000; or
> > (c) The excess of the amount the court or the jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

159.    Defendant's action in refusing coverage under the Civil Authority provision of the contract was vexatious and unreasonable in that there is no genuine, actual, or real dispute about:

a.    Whether the Illinois Executive Orders prohibiting access to Plaintiff's premises were issued because of direct damage or dangerous physical conditions at other properties – because the Executive Orders state on their face that they are due to the rapid spread of COVID-19 throughout the state of Illinois involving statewide damage and danger, including in bars and restaurants; and

      b.    Whether the policy requires prohibited access to the area surrounding the premises – because the plain language of the policy contains no such requirement.

160.    Defendant's proffered reasons for denying Plaintiff's Civil Authority claim for coverage were pre-textual and for no purpose other than harassment or delay.

161.    As a direct and proximate result of Defendant's vexatious or unreasonable refusal to honor the insurance contract, Plaintiff sustained additional damages, including attorney's fees.

## <u>COUNT III – COMMON LAW FRAUD</u>

162.    Plaintiff realleges all previous allegations as if set forth fully herein.

163.    Defendant stated in the Civil Authority provision of its policy:

We will pay for the actual loss of 'Business Income' you sustain and 'Extra Expense' you incur caused by action of civil authority that prohibits access to the 'premises' due to direct physical 'loss' to property, other than at the 'premises,' caused by or resulting from any Covered Cause of Loss. This coverage will apply for a period of up to 30 consecutive days from the date of that action.

164.    Defendant's statement about Civil Authority coverage was material.

165.    At the time Defendant made its statement about Civil Authority coverage, it was aware of the language in the ISO virus exclusion it declined to include in its policies that would be designed to exclude loss from viruses or pandemics.

166.    Defendant made the statement in its Civil Authority coverage, including declining to include a virus exclusion, with no intent to actually pay losses due to a virus or pandemic.

167.    Defendant made its false statements with the intent to induce Plaintiff and other businesses to enter into an insurance relationship with it rather than with insurers excluding coverage for viruses.

168.    Defendant omitted to inform Plaintiff that it would refuse to cover loss caused by statewide civil authority orders that applied to Plaintiff's business and premises.

169.    Plaintiff relied on Defendant's statements about its coverage promises.

170.    Plaintiff purchased Defendant's policy in reliance on Defendant's statements about its covered promises.

171.     Plaintiff sustained Business Income Loss and incurred Extra Expense caused by multiple separate civil authority orders that prohibited access to Plaintiff's premises due to direct physical loss to property other than at the premises.

172.     Plaintiff suffered damages as a result of Defendant's deception, including:

    a.    lost benefit of the bargain damages;

    b.    loss suffered from coverage that Defendant promised but did not deliver upon; and

    c.    attorney's fees.

173.     Defendant's acts constituted willful, intentional, and malicious behavior.

## COUNT IV – VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

174.     Plaintiff realleges all previous allegations as if set forth herein.

175.     Plaintiff is a person within the meaning of ILCS 505/1(c).

176.     Defendant's sale of insurance policies in the State of Illinois constitutes "trade" or "commerce" within the meaning of ILCS 505/1(f).

177.     The Illinois Consumer Fraud and Deceptive Trade Practices Act prohibits the use of unfair and deceptive business practices in the conduct of trade or commerce.

178.     Specifically, Section 2 of the Act provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act," approved August 5, 1996, in the conduct of trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived, or damaged thereby.

815 ILCS 505/2.

179.     Among other things, Section 2 of the "Uniform Deceptive Practices Act" defines deceptive trade practices to include anytime a person, including a busines "represents that the goods or services have characteristics that they do not have."

180.     Defendant engaged in unfair and deceptive business practices by:

     a.    Engaging in a massive state-wide fraud in which Defendant collected premiums for commercial insurance policies lacking the ISO's purported virus exclusion but nonetheless summarily denying coverage for losses due to COVID-19;

     b.    Promising Plaintiff it would provide it with a certified policy so that Plaintiff could file its Complaint when, in reality, Defendant had no intention of doing so and was not actively attempting to do so.

     c.    Fraudulently inducing Plaintiff into paying premiums for policies lacking the purported ISO virus exclusion while intending to nonetheless deny coverage for claims potentially falling within such a purported virus exclusion.

181.    Defendant's conduct induced Plaintiff into paying premiums for insurance policies that it would not have otherwise procured absent Defendant's deceitful conduct.

182.    Defendant's post-denial false promises were intended to obstruct Plaintiff from filing suit and were successful in creating, unnecessary, unfair, and deceitful additional delay which further caused damage to Plaintiff by depriving it of essential financial resources during an unprecedented health and financial crisis which it would not have otherwise suffered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following:

A.    That the Court declare that Plaintiff's losses are covered by Defendant's policy;

B.    That the Court, through a jury, award compensatory and punitive damages in such amount as demonstrated by proof at trial and that the Court deems just and proper;

C.    That the Court enter an order requiring Defendant to pay Plaintiff the costs of litigation and attorney's fees; and

D.    Any other orders or relief the Court deems just and proper.

Respectfully Submitted,

SIMMONS HANLY CONROY

/s/ Ted N. Gianaris_____
Ted N. Gianaris, IL#6237156
Eric S. Johnson, IL#6301759
G. Michael Stewart, IL#6230339
One Court Street
Alton, IL 62002
618.259.2222
618.259.2251 (Fax)
tgianaris@simmonsfirm.com
mstewart@simmonsfirm.com
ejohnson@simmonsfirm.com